## Huff vs. Roane, et al.

The cases of *Dardenne vs. Hardwick*, (4 *Eng.* 485) and *Hempstead vs. Johnson* (18 *Ark.* 141,) as to presumption of fraud in courts of law and equity, explained and reconciled.

No general rule has been established by which conveyances alleged to be fraudulent can certainly be so adjudged—Each case must rest upon its own circumstances.

A debtor, who is insolvent, or in failing circumstances, may, by deed bona fide made, give preference to a particular creditor, and such conveyance will not be disturbed by a court of equity.

But a court of equity will not allow a deed of trust to be the foundation of an action, where the proof—for which see opinion—shows that it was the intention of the parties to concoct a simulated demand; that the whole proceeding was fraudulent in design and in execution, in its beginning, progress and end.

*Appeal from Jefferson Circuit Court in Chancery.*

Hon. THEODORIC F. SORRELLS, Circuit Judge.

GARLAND for the appellant.

Possession of property by the grantor for a reasonable period authorized by a deed, is no badge of fraud. *Taylor vs. Vaughn et al.* 18 *Ark.* 65: *Ib.* 123.

To prevent multiplicity of suits, removal of property, etc., equity will take cognizance of a private trust.

WATKINS & GALLAGHER, for appellees.

The facts disclosed prove that the deed was executed to defraud creditors and is therefore void.

Mr. Justice FAIRCHILD delivered the opinion of the court.

In *Dardenne vs. Hardwick*, 4 *Eng.* 485, it was said : " Fraud

will never be presumed in a court of law, although a somewhat different rule prevails in a court of equity; but even there, when an act does not necessarily import fraud, and may have as well occurred from good as bad motives, fraud will not be inferred."

We do not suppose that it was intended, in the above extract, to assert as a legal principle, that fraud would be presumed in a court of equity without legal grounds of presumption; but simply to show that in comparison with the modes of establishing fraud in a court of law, the means adopted by a court of equity for an examination of alleged fraudulent conduct, would sometimes induce the conclusion, and affirm the existence of fraud, when no inquiry of the sort could be prosecuted in a court of law, or when, if the question of fraud were raised, no affirmative response could be had upon the same facts that would cause its assertion and exposure in a court of equity.

In equity, as in law, the facts must be shown to exist that constitute fraudulent dealing; that is, that show something to be done with dishonest intentions, and with an injurious effect, or tendency, against the interest of the party complaining of the alleged fraud. But courts of law, from being confined to the literal construction of deeds, and to the validity of rights dependent upon them, and from being compelled to declare the character of acts from their outward manifestations, and as apparent to the observation of others, compare disadvantageously in the ascertainment of frauds, and in the administration of remedies against them, with courts that appeal to the consciences of the actors, and, in the construction of acts and writings, consider the positions, motives and influences that operate upon men in any given state of mind, or social or pecuniary condition; and, in affording relief, hold as done, and compel to be done, that which ought to be done, and undo that which ought not to be done.

The differences in the practice observed, and remedies afforded by courts of law and equity, which are the main constitutional differences between them, afford an explanation to expressions that would otherwise be repugnant to each other, and

inconsistent with settled legal principles. Hence, there is no real conflict between the quotation made from *Dardenne vs. Hardwick*, and this that follows :

" It is equally a rule in courts of law and equity, that fraud is not to be presumed; but it must be established by proofs. Circumstances of mere suspicion leading to no certain results, will not, in either of these courts, be deemed a sufficient ground to establish fraud. On the other hand, neither of these courts insists upon positive and express proofs of fraud ; but each deduces them from circumstances affording strong presumptions. But courts of equity will act upon circumstances as presumptions of fraud, where courts of law would not deem them satisfactory. In other words, courts of equity will grant relief upon the ground of fraud, established by presumptive evidence, which evidence, courts of law would not always deem sufficient proof to justify a verdict at law." *Hempstead vs. Johnson*, 18 *Ark*. 144: *see also Clinton vs. Estes*, 20 *Ark*. 245, 246.

No general rule is laid down in the books, by which conveyances, alleged to be fraudulent, can be so adjudged, but we are often admonished that each case must depend upon its own circumstances. Then, whether the deed of trust made in Amite county, Mississippi, on the 13th of April, 1854, by which the negroes involved in this suit, were conveyed by Charles Ratcliff to Reuben L. Huff, to secure a debt acknowledged to be due to William Woodward and Seymour Taylor, administrators of Joicy B. Ratcliff, deceased, be valid, and uphold this suit of Huff, the trustee, or invalid and thus make good the defence of Benjamin C. Ratcliff, Henry Jones, and Julia Roane, subsequent purchasers of the negroes, must depend upon the attendant facts and circumstances that are brought into the case as evidence to maintain and overthrow the trust deed. The consideration of such evidence may then be the first effort of this opinion, and its only one, if the conclusion deduced therefrom be unfavorable to the claim of the plaintiff, the trustee of the deed and the prosecutor of this appeal.

It is evident from the record, that Charles Ratcliff was em-

barrassed by debts, when he made the trust deed. This is implied in the parol testimony, is shown by documentary evidence, and by the admissions of the trustee, the plaintiff and appellant. The demand of Michael Simon, on which judgment was rendered for twelve hundred and twenty-two 97-100 dollars, was in existence at the time of the execution of the deed of trust; and it may well be inferred that the eight other judgments admitted in the court below to be evidenced by transcripts on file in the cause, amounting to seven thousand dollars, were represented by demands in some form, on the 13th of April, 1854, they being, according to the admission in the record, like suits with that of Simon. The validity of the deed of trust does not, however, depend upon the fact of Charles Ratcliff's indebtedness, and though made in failing circumstances, if it was made to secure a real, an honest demand, the maker had a right to give that demand preference to other debts he owed, as the right of an insolvent debtor to prefer favorite creditors, or demands, is tolerated by the law. Thus, we held, at the present term of the court, in *Carnall vs. Duval*, that Johnson, Grimes & Co., might well prefer the debt due from them to Marcellus Duval; not because the debt was a meritorious one, as we characterized it, but because the law gave them the privilege of a preference. Equity never commends a man for making a distinction between just debts; it only holds that preferences made without bad faith to the unpreferred creditor, may be endured. Upon the subject of distribution of the property of a bankrupt, or an insolvent person, its favorite maxim is, 'equality is equity.'

The deed of trust was made to secure William Woodward and Seymour Taylor, administrators of Joicy Ratcliff deceased, in a note executed to them by Charles Ratcliff, of the same date as the deed, and for the sum of eleven thousand, two hundred and sixty-eight 83-100 dollars, payable ten days after date.

Joicy Ratcliff was the wife of Charles Ratcliff, and died in 1848. That she had any separate estate that ought to be administerd upon, or taken away from Charles Ratcliff, is not shown to have occurred to the mind of any body, till on the se-

cond Monday of April, 1854, William Woodward and Seymour Taylor, the son-in-law of Charles Ratcliff, sued for, and obtained letters of administration upon her estate.   On the 13th of the same month, a settlement was made by Charles Ratcliff with Woodward and Taylor, of his dealings with the separate property of his wife, as he and they considered it, which resulted in his falling in debt to his wife's administrators in the sum for which the note was given; as above stated.

The avowed consideration of the note, as shown by the testimony concerning the settlement, was made up in part of the hire of sixteen negroes for the years 1848, to 1853, including those years; which negroes, in the settlement, were dealt about by the parties as belonging to Joicy Ratcliff in her own right. Of these sixteen negroes, but four ever came to the hands of Charles Ratcliff, as his wife's property.   In twelve of the negroes Mrs. Ratcliff had no interest as heir, as vendee; had and made no claim to them as her separate property.   Some of the slaves, as Peter, Linda and Mary, Charles Ratcliff had bought, and had owned fifteen or twenty years before 1848, the beginning of the term of years for which he accounted to his wife's administrators for their hire ; Katharine he had owned eight or nine years before 1848 ; Tilly he derived from his father's estate, from her came Martha and Emily ; Eliza was Linda's daughter ; Loyd was from Mary; Jack, Adam, and Eve he raised; while four of the sixteen, Aggy, Wiley, Job and Ephraim came from the estate of Holloway Huff, the father of Joicy Ratcliff.   According to the estimate of the hire made in the settlement, more than five thousand dollars of the acknowledged indebtedness, accrued from the labor of the slaves that belonged absolutely to Charles Ratcliff himself, to which Joicy Ratcliff, his wife, under the Mississippi Married Woman's law, had no claim, and to which it is not shown that she or her friends for her; before or after her death, made any pretence of right, till the concession made in the settlement by the husband, and accepted by the beneficiaries in the deed of trust.   These facts appear in the depositions of William L. Huff and Peter

Ratcliff, and were also so stated on the public record, by or for Charles Ratcliff himself, as will be seen hereafter.

The four negroes, Aggy, Wiley, Job and Ephraim, that Charles Ratcliff received as part of his wife's portion of the estate of her father, Holloway Huff, were delivered on the 27th of January, 1845 ; by virtue of which, under the law of Mississippi, Charles Ratcliff acquired a life interest in them, so as to be entitled to their hire and services against the representatives of his wife. This is testified to by David L. Huff, a practicing lawyer of Mississippi, since 1842, and agrees with the information we have of the law of that State from its authorized publication and exposition by the High Court of Errors and Appeals; though we disclaim acting upon foreign law, unless it comes to us through the channel of testimony. That part of the consideration of the note secured by the deed of trust, and represented by the hire of negroes, amounting to about eight thousand four hundred dollars, was a feigned consideration, and could not impart any obligation to the note, or validity to the deed of trust.

Another item of the indebtedness found by the settlement, was for eight hundred and thirty-three dollars, and sixteen years interest thereon, which principal sum Charles Ratcliff confessed to have received from his wife's father, about the early part of 1839. In another deposition of the same witness who testifies to the above, that witness being William L. Huff, the item is spoken of as one thousand dollars. This part of the foundation of the note and trust deed was no support for either. The money came to the hands of the husband ; if it had been given to the wife directly, it would no less have been the husband's. The note was without consideration so far ; and this seems to have been well understood by Charles Ratcliff, when, as the time transpired for him to be sued on the note, which was the next month after it was given, he pleaded a failure of consideration as to the eight hundred and thirty-three dollars and interest, and as to the hire of slaves that had never been the separate property of his wife, which plea and trial thereon reduced

the judgment upon the note to four thousand six hundred and twenty-one 35-100 dollars. This appears by the testimony of David L. Hurst, and by an exemplification of the judgment and proceedings in the case of Woodward & Taylor against Charles Ratcliff, in the transcript. When this settlement was made of the interests of Joicy Ratcliff's estate, Charles Ratcliff and Woodward and Taylor settled individual dealings, in which a balance was struck upon the opposite side in favor of Ratcliff, for which he took their note for twenty-eight hundred and ninety-two dollars, but when payable, or how secured has not been made to appear in the record. Many other negroes in the possession of Charles Ratcliff were levied upon by different executions, but were claimed by Woodward and Taylor as the property of the estate of Joicy Ratcliff.

Notwithstanding the default in the payment of the note, the suit and judgment thereon, no steps were directed to be taken by the trustee to enforce the remedy provided for in the deed of trust. Charles Ratcliff's possession of the negroes in controversy was not disturbed, and they remained with him till on the 6th of December, 1854, he transferred them to Benjamin C. Ratcliff and Henry Jones, through whom they soon appeared in Jefferson county.

Such are some of the facts of this case that an inspection of the transcript has brought to our notice. We forbear all comment upon them, being desirous to observe that decent temperateness of language that is becoming to judicial expression.

But we do not need to be informed of the character of the transaction, by the opinion of witnesses who were present at the settlement, or were acquainted with the facts upon which the deed of trust is founded. Those opinions, however accordant with our own, and however inevitable to be entertained by all who know the facts, or become informed of them, by their record in this case, are not taken by us as evidence. On the facts themselves we base our conclusion, that the letters of administration upon the estate of Joicy Ratcliff were procured with the design of concocting a simulated demand; that the

settlement, the note, the deed of trust, are the fruits of that scheme, which was fraudulent in design and in execution, in its beginning, progress and end.

We have examined the Mississippi Reports upon the subject of fraudulent conveyances, and no where do we find more evidences of an elevated judicial sentiment than is manifested by the highest court of that State. If we had found any reason, from its decisions, to suppose that the deed of trust in this case would have been regarded in that court, differently from the way we have found ourselves compelled to regard it, our respect for that court would have caused us to doubt the soundness of our conclusion. But though we find many cases of fraudulent acts and conveyances to have been passed upon and annulled, we find none that would have been more reprobated in the Mississippi court, than the transaction which the court below refused to sanction, by allowing it to be the foundation of an action, and whose decree we approve by entering its affirmance in this court.